IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| **GREGORY WARREN KELLY,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19CV00032 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **TOWN OF ABINGDON, VIRGINIA,** | ) | By:  James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Thomas E. Strelka, L. Leigh R. Strelka, N. Winston West, IV, and Brittany M. Haddox, STRELKA LAW OFFICE, PC, Roanoke, Virginia, for Plaintiff; Ramesh Murthy and Cameron S. Bell, PENN, STUART & ESKRIDGE, Abingdon, Virginia, for Defendant.*

In this employment-related civil case asserting claims under the Americans with Disabilities Act ("ADA") along with a state law breach of contract claim, I previously granted the defendant's Motion to Dismiss as to the ADA claims. *Kelly v. Town of Abingdon, Va.*, No. 1:19CV00032, 2020 WL 525296 (W.D. Va. Feb. 3, 2020). The plaintiff has now filed a Motion for Leave to File Amended Complaint, which the defendant opposes. For the reasons that follow, the motion will be granted in part and denied in part.

I.

The plaintiff, Gregory Warren Kelly, was hired by the Town of Abingdon, Virginia ("Town"), on March 1, 2005, to serve as the Town Attorney. On September 7, 2006, he was appointed Town Manager, a position he held until May 7, 2018. He

claims he was constructively discharged.  He suffers from anxiety, high blood pressure, and depression, for which he takes daily medication, and which have affected his daily life activities of sleeping, eating, breathing, and having "normal circulation."  First Am. Compl. ¶ 10, ECF No. 15-1.

The allegations of the original Complaint are summarized in my earlier Opinion.  2020 WL 525296, at *1–3.  To those allegations, the proposed First Amended Complaint adds the following factual averments, which I must accept as true at this stage of the proceedings.[1]

Kelly alleges that actions by members of the Town Council, to whom he reported, caused him increased stress and aggravated his disabilities.  He avers that Town Council members' actions impaired his ability to concentrate at work; exacerbated his high blood pressure, causing him to feel faint; and triggered panic attacks.  Various Town staff members who viewed these panic attacks would frequently check his blood pressure in the office and urge him to seek medical help or go home because they were concerned for his health.

Kelly asserts that former Mayor Cathy Lowe and former Vice Mayor Rick Humphreys regularly told Kelly that he "needed to 'get on board' with their agendas or he would be terminated.  Ms. Lowe stated that if she was not re-elected or 'if you

---

[1]  These factual allegations have yet  to be proved by the plaintiff and of course I make no prediction as to whether the plaintiff can ultimately prevail.

do not support me,' Mr. Kelly would lose his job." First Am. Compl. ¶ 16, ECF No. 15-1. Lowe warned Kelly that making certain decisions contrary to her interests "'would not go well for [him].'" *Id.* at ¶ 17. Kelly also alleges that Lowe continually demanded that Kelly appoint Lowe's personal friends to positions for which they were unqualified.

Kelly asserts that Humphreys on several occasions called him and two other Town officials, former Town Attorney Deborah Icenhour and former Town Clerk Cecile Rosenbaum, "late at night or during early morning hours in a drunken rage." *Id.* at ¶ 19. Humphreys belligerently stated that "if Mr. Kelly did not do things that he wanted done, he would intentionally make Mr. Kelly's, Ms. Icenhour's, and Ms. Rosenbaum's lives miserable." *Id.* Humphreys often appeared intoxicated and used profanity toward Kelly and other Town employees. His requests were motivated by personal interests. For instance, Humphreys owned property near railroad tracks that pass through Abingdon and wanted the Town's no-blow whistle ordinance to be enforced. The ordinance prohibited trains from blowing their whistles within Town limits at certain hours. Kelly told Humphreys that the railroad was complying with the ordinance and blowing whistles only to warn of potential dangers, as allowed by law. Kelly repeatedly reminded Lowe and Humphreys that he worked for the Town Council as a body and had to serve a majority of the council rather than individual members.

Kelly hired a Director of Tourism, and Humphreys constantly intentionally mispronounced his name.  This angered the employee, who threatened to quit.  Kelly organized a meeting with Humphreys and the employee in order to mediate the dispute.  Humphreys stated to the employee, "'listen you little son of a bitch, you start doing things the right way, or I will have your job.'"  *Id.* at ¶ 26.  When Kelly told Humphreys that he did not have the authority to terminate the employee and that only Kelly possessed that authority, Humphreys responded, "'well, we'll see about that.'"  *Id.* at ¶ 27.

Kelly alleges that Humphreys frequently belittled and humiliated him and Town staff in private and in public meetings.  "On occasion, members of the public who were the subject of agenda items would contact Mr. Kelly threatening legal action against the Town if he did not get Mr. Humphreys under control.  In addition, Town staff often complained to Mr. Kelly about the abuse."  *Id.* at ¶ 29.  "These hostile abuses by Mr. Humphreys undermined Mr. Kelly's ability to demonstrate his authority of management over town employees as his managerial actions were often overridden unlawfully by Mr. Humphreys and other Council members."  *Id.*

Kelly alleges that Lowe, Patterson, Craig, and Humphreys repeatedly made demands directly of Town employees, despite Kelly's supervisory authority over the employees.  Some of the directives were not related to Town business and were instead related to personal interests of the Council members.

Current Town Mayor Wayne Craig was a member of a group called the Friends of Abingdon ("FOA"), which opposed a major shopping center project known as the Meadows. Craig told Kelly that if FOA did not get its way regarding the Meadows, "'you are going to be fired.'" *Id.* at ¶ 30. Craig directed Kelly to meet with the president of FOA and stated that the FOA president controlled whether Kelly would be terminated, reminding Kelly that Craig was a member of FOA.

Town Clerk Rosenbaum wrote an article for a local government manager's newsletter regarding a personal experience of sexual harassment by a former Town employee. Craig then approached Kelly laughing and stated, "'Damn Greg, what's her problem? If a female tried to harass me in an elevator, I would welcome it.'" *Id.* at ¶ 31. Kelly pleads that he "found this statement to be threatening toward the treatment of town employees and highly offensive and unprofessional." *Id.*

Craig made demeaning comments to other Town employees as well, and Kelly asserts that these comments "were indicative of the enmity that he held towards Mr. Kelly and his contempt for Mr. Kelly's hiring decisions." *Id.* at ¶ 33. Craig told an employee "he looked like an 'idiot' because he wore a winter hat" to a Christmas breakfast. *Id.* at ¶ 32. Craig asked the employee's department, and the employee replied that he was the Director of Public Works. Craig then called him an "'asshole'" in front of other Town employees. *Id.* Craig had called the prior Director of Public Works the same name in a meeting with officials of the Virginia

Department of Transportation.  Kelly alleges that he attempted to discourage these types of remarks, but public ridicule of Town employees by Craig and other Town Council members escalated.  Kelly alleges that Craig called him an "'asshole'" in a meeting of engineers at which Kelly was present.  *Id.* at ¶ 50.  Kelly believed this comment reflected poorly on the Town and Kelly's reputation.

Former Mayor Lowe asked to borrow Kelly's computer on one occasion, and Kelly "believed she began looking for private communications from or to Mr. Kelly and/or to delete digital evidence that existed at the time based on his observations of the computer after her use." *Id.* at ¶ 34.  Lowe sought access to Icenhour's computer on the same day.  "Mr. Kelly believed that his work data was continually under threat of review and/or deletion by Town leaders to serve their own purposes based on Ms. Lowe's and other Town leader's conduct." *Id.* at ¶ 35.  Kelly cites another example when Lowe insisted on seeing Kelly's phone while he was driving the two of them to a meeting in Richmond.  "Mr. Kelly believed that she again looked for private messages based on his observations after she returned his phone." *Id.* at ¶ 36.  On another occasion, Lowe asked Kelly to hand her his smart watch.  "Mr. Kelly believed Ms. Lowe began looking for private messages that were stored on the device, based on the appearance of the smart watch upon its return." *Id.* at ¶ 38.

Kelly alleges that he stored private messages and communications, including his employment contract and legal files from his prior private law practice, on a

Town network drive that was created for him and was only to be accessible by him. "After Mr. Kelly filed an EEOC Charge, this digital documentation was suspiciously erased.  Mr. Kelly contacted the Town's IT department who confirmed that the drive had been erased." *Id.* at ¶ 37.

Kelly claims that his work environment caused spikes in his blood pressure and dizzy spells while he was at work.  He began to have difficulty performing work tasks such as reading and writing emails and responding to inquiries.  He also experienced anxiety due to the behaviors of Town leaders, which caused disorientation, confusion, insomnia, panic attacks, and feelings of hopelessness.  His physician told him "he should request accommodations or remove himself from his working environment in order to protect himself from worsening and depleting health." *Id.* at ¶ 41.

Kelly alleges that after he filed charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") on September 13, 2017, and December 27, 2018, he continued to experience discrimination due to his disabilities and in retaliation for filing EEOC charges.  He further alleges that the Town's actions against him worsened after he filed the charges.

Upon his doctor's advice to seek accommodations for his disabilities, Kelly directed his lawyer to send a letter to the Town on January 10, 2018, purporting to seek reasonable accommodations.  The specific requests in the letter are set forth in

my earlier Opinion and Order.  2020 WL 525296, at *2–3.  As I noted previously, "The letter was sent on behalf of Kelly and two other Town employees and made the same collective requests on behalf of all three individuals. The letter did not identify any particular disabilities or tie the requests to limitations associated with disabilities." *Id.* at *2.  Rather, it had the stated goals of fostering respect and communication.  In response to the letter, the Town did not attempt to engage Kelly in an interactive process to find reasonable accommodations for Kelly's disabilities. "The Town's refusal to engage in the interactive process resulted in the failure to identify an appropriate accommodation."  First Am. Compl. ¶ 45, ECF No. 15-1. "The Town, after requests for accommodations were made, in fact escalated its defiant behavior regarding each of the requested accommodations in an open and flamboyant manner to state to Mr. Kelly that they, as elected officials, were not subject to the requirements of ordinary business employers." *Id.* at ¶ 46.

Town Clerk Rosenbaum had filed EEOC charges similar to those filed by Kelly.  After her employment terminated, Lowe told Kelly, "'we got rid of one big problem and now it's time to get the Town under control.  We expect you to be in the office and not at the other departments or visiting work sites.'" *Id.* at ¶ 47.  Lowe, Humphreys, Craig, and Town Council member Cindy Patterson then "demanded more of Mr. Kelly on a daily basis and began interfering much more severely in his abilities to exercise his managerial duties of his staff." *Id.*  Kelly's health worsened.

Kelly disclosed his disabilities in individual conversations with Lowe, Humphreys, Craig, Patterson, Town Council Member Bob Howard, and former Mayor Ed Morgan. He explained that his blood pressure condition was exacerbated by workplace stress and that he was experiencing panic attacks and anxiety that led to disorientation and confusion.

When Kelly began parking away from Town Hall and walking to work in an effort to improve his health, Town Council members ridiculed him for doing so. Kelly contends that "the Council created an environment so hostile and life threatening to Mr. Kelly that Mr. Kelly was left with no alternative but to leave employment with the Town in order to salvage his health." *Id.*

Word of Kelly's EEOC filings spread throughout Town Hall, and department heads would often congregate in Kelly's office the day after Town Council or Planning Commission meetings to console him because of how he had been treated at the meetings. Kelly alleges that after these meetings, Lowe and Humphreys would appear or call the Town Clerk to influence her drafting of the meeting minutes to appear more favorable to them.

According to the proposed First Amended Complaint, Humphreys, Lowe, and Craig each individually threatened to terminate Kelly's employment without authority or legal justification. The threats of termination increased after each EEOC charge Kelly filed.

Kelly resigned his employment on May 7, 2018.  He contends that he could perform the essential functions of his position as Town Manager, or his prior position as Town Attorney, either with or without accommodation.  "Mr. Kelly's essential job functions included answering emails, answering inquiries from Town stakeholders, and managing the Town's day-to-day business affairs." *Id.* at ¶ 67. He asserts that he was meeting or exceeding the Town's legitimate business expectations and "did not receive negative performance evaluations except as retaliation for having disabilities and/or asking for reasonable accommodations." *Id.* at ¶ 68.  Kelly avers that his "requested reasonable accommodations would have decreased the severity of the physical manifestations of his disabilities and restored his ability to complete the essential functions of his job as efficiently as he had before the Town leader's actions." *Id.* at ¶ 72.  He alleges that he "requested reasonable accommodations of short breaks and reduced stress, among other reasonable accommodations.  Short breaks and reduced stress . . . would have lowered the likelihood of Mr. Kelly becoming faint at work due to his high blood pressure, for example." *Id.* at ¶ 100.  He feared taking short breaks on his own initiative because he thought he would be fired for doing so, based on council members' past statements and threats of termination.

Kelly's proposed First Amended Complaint asserts the same four claims under the ADA as his original Complaint: disability discrimination, retaliation,

failure to accommodate, and interference.[2]   The Town argues that the new allegations remain insufficient to state viable claims for relief under the ADA.

## II.

Federal Rule of Civil Procedure 15 provides that in order to amend his Complaint at this juncture, Kelly must obtain either the defendant's consent or leave of court.  The court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Nevertheless, "a district court has discretion to deny a motion to amend a complaint, so long as the court does not 'outright refus[e] to grant the leave without any justifying reason.'"  *Howard v. Lakeshore Equip. Co.*, 482 F. App'x 809, 811 (4th Cir. 2012) (unpublished) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  Denial of leave to amend is appropriate "when the amendment would be prejudicial to the opposing party," when the plaintiff has acted in bad faith, or when the amendment would be futile.  *Laber v. Harvey*, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (internal quotation marks and citations omitted).  "A proposed amendment is futile when it is clearly insufficient or frivolous on its face," or "if the claim it presents would not survive a motion to dismiss."  *Save Our Sound OBX, Inc. v. N.C.*

---

[2] The proposed First Amended Complaint in Count V also continues to assert a state law breach of contract claim based on the Town's failure to make a severance payment. Because I previously denied the Town's Motion to Dismiss as to that claim, I do not address it here.

*Dep't of Transp.*, 914 F.3d 213, 228 (4th Cir. 2019) (internal quotation marks and citations omitted).

### A.  Count I:  Discrimination.

The ADA protects qualified individuals with disabilities from discrimination on the basis of their disabilities. 42 U.S.C. § 12112(a); *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 278-79 (4th Cir. 2004).  A qualified individual is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

> In an ADA wrongful discharge case, a plaintiff establishes a *prima facie* case if he demonstrates that (1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

*Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001).

In this case, Kelly claims that he was constructively discharged.  "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign."  *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (internal quotation marks and citation omitted).  In such a situation, the law will treat the employee's resignation as a discharge.  *Id.*

"In assessing intolerability, the frequency of the conditions at issue is important." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019). "[W]hen the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Id.* "Further, difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign." *Id.* The question is not whether resigning was the plaintiff's wisest or best choice under the circumstances, but rather whether a reasonable person in the plaintiff's position "would have had *no choice* but to resign." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019) (internal quotation marks and citation omitted). This standard is higher than the severity or pervasiveness required to prove a hostile environment harassment claim. *Id.*

I conclude that the new allegations, if true, could amount to sufficiently intolerable working conditions to support a constructive discharge theory. I also find that Kelly has alleged enough facts to overcome a motion to dismiss as to whether he was meeting his employer's legitimate expectations. He has therefore satisfied the first three elements of his disability discrimination claim.

Count I still fails to state a viable claim, however, because the new allegations do not raise a reasonable inference of disability-based discrimination. While the alleged actions and statements by Humphreys and Lowe are regrettable if true, the First Amended Complaint suggests that they were driven by political and personal

motivations unrelated to Kelly's disabilities.   These alleged motivations include opposition to the Meadows development, a desire to be reelected, personal concerns about noise from train whistles, and an interest in having personal friends appointed to positions within the Town.  The First Amended Complaint alleges that improper and unsavory behaviors were directed at other Town officials and employees who are not alleged to have suffered from disabilities.   The new allegations simply do not give rise to an inference that the Town treated Kelly less favorably than others due to his disabilities.

Because Kelly's claim of disability discrimination would not survive a motion to dismiss, I conclude that amendment would be futile as to Count I.  I will therefore deny the motion to amend as to that count.

### B.  Count II:  Retaliation.

To establish a claim of retaliation under the ADA, a plaintiff must show that "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012).

Requesting a reasonable accommodation and filing a charge of discrimination with the EEOC are both protected conduct under the ADA.  Kelly has now alleged sufficient facts to render his constructive discharge theory plausible and has thus pled that he suffered an adverse action.  In addition, I find that he has stated facts

which, if true, could demonstrate a causal link between his filing of EEOC charges and his constructive discharge.

In the proposed First Amended Complaint, Kelly asserts that the Town's mistreatment of him worsened after he filed EEOC charges. He specifically alleges that threats of termination increased after the filing of his charges. He also avers that data was deleted from his computer drive after he filed a charge of discrimination. These allegations, if believed, could support a viable claim of retaliation under the ADA. I will therefore grant the motion to amend as to Count II.

### C. Count III: Failure to Accommodate.

The ADA requires an employer to "make reasonable accommodations for an applicant or an employee's disability." *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 371 (4th Cir. 2008). The applicable regulation provides:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). To state a claim for failure to accommodate, a plaintiff must plausibly allege "(1) that he was an individual who had a disability within the meaning of the statute; (2) that the employer had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position;

and (4) that the employer refused to make such accommodations." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013) (internal quotation marks, alterations, and citations omitted).

I previously held that the January 10, 2018, letter from Kelly's counsel to the Town could not support his failure to accommodate claim. *Kelly*, 2020 WL 525296, at *7. I adhere to that ruling, but I find that Kelly has now alleged enough facts that, if true, would support a failure to accommodate claim based on his request for short breaks and reduced stress. He has now "explain[ed] why short breaks were necessitated by his disabilities" and "how they would have helped him to perform the essential functions of his job." *Id.* These new allegations are enough to survive a motion to dismiss as to the failure to accommodate claim. Kelly has pleaded facts that would satisfy all four of the elements set forth above. I therefore will grant the motion to amend as to Count III.

### D.  Count IV:  Interference.

The ADA provides:

> It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

42 U.S.C. § 12203(b). There are few appellate decisions construing this subsection. The Seventh Circuit has found that a plaintiff alleging ADA interference must show:

(1) she engaged in activity statutorily protected by the ADA; (2) she was engaged in, or aided or encouraged others in, the exercise or enjoyment of ADA protected rights; (3) the defendants coerced, threatened, intimidated, or interfered on account of her protected activity; and (4) the defendants were motivated by an intent to discriminate.

*Frakes v. Peoria Sch. Dist. No. 150*, 872 F.3d 545, 550–51 (7th Cir. 2017). "Protected activities are those statutorily protected under the ADA," including "formal complaints of discrimination." *Id.* at 551. A request for an accommodation is protected activity. *See Haulbrook*, 252 F.3d at 706.

The EEOC has issued guidance in which it sets forth several examples of conduct that would be considered interference. The example most applicable here is "coercing an individual to relinquish or forgo an accommodation to which he or she is otherwise entitled." U.S. Equal Emp't Opportunity Comm'n, *Enforcement Guidance on Retaliation and Related Issues*, No. 915.004, 2016 WL 4688886, at *26 (2016).

I find that the new allegations do not state a cognizable claim for interference under the ADA. The First Amended Complaint contains no suggestion that the Town attempted to dissuade Kelly from seeking accommodations or filing EEOC charges. Although Kelly avers that certain Town Council members threatened to terminate him, the First Amended Complaint gives no indication that the threats were designed to coerce Kelly into forgoing reasonable accommodations or to prevent him from filing charges of discrimination. *See Brown v. City of Tucson*, 336

F.3d 1181, 1192-93 (9th Cir. 2003) (noting that the ADA's anti-interference provision "clearly prohibits a supervisor from threatening an individual with transfer, demotion, or forced retirement unless the individual foregoes a statutorily protected accommodation").  Rather, Kelly alleges that the Town essentially ignored his accommodation requests and later retaliated against him for filing EEOC charges.

While those allegations may support his claims of retaliation and failure to accommodate, they are inadequate to support his interference claim, which is a separate and distinct legal theory.  To allow Kelly's interference claim to proceed based on the allegations in the First Amended Complaint would result in a complete blurring of the lines between his interference claim and his retaliation claim.[3]  I do not believe that is what Congress intended in drafting the statute, and I thus conclude that the proposed amendment would be futile as to Kelly's claim of ADA interference.  I will therefore deny the motion to amend as to Count IV.

## III.

For the foregoing reasons, the Motion for Leave to File Amended Complaint, ECF No. 15, is GRANTED IN PART and DENIED IN PART.  The motion is

---

[3] *But see Stewart v. Ross*, Nos. 1:18-CV-1369 (LMB/TCB), 1:16-CV-213 (LMB/JFA), 2020 WL 1907471, at *17 (E.D. Va. Apr. 17, 2020) (concluding that ADA interference and retaliation claims entirely overlap, and analyzing both types of claims in the same manner).

DENIED as to Counts I (ADA Discrimination) and IV (ADA Interference) and

GRANTED as to Counts II (ADA Retaliation) and III (ADA Accommodation).  The

case will proceed hereafter only as to Counts II (ADA Retaliation), III (ADA

Accommodation), and V (Breach of Contract).  The Clerk shall refile the First

Amended Complaint now filed at ECF No. 15-1.  The defendant shall respond in

accord with the Federal Rules of Civil Procedure.

It is so **ORDERED**.

ENTER:  May 20, 2020

/s/  *JAMES P. JONES*
United States District Judge