## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **GREGORY WARREN KELLY,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:19CV00032 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **TOWN OF ABINGDON, VIRGINIA,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| Defendant. | ) | |

*Monica L. Mroz, STRELKA EMPLOYMENT LAW, Roanoke, Virginia, for Plaintiff; Cameron S. Bell and Ramesh Murthy, PENN, STUART & ESKRIDGE, Abingdon, Virginia, for Defendant.*

In this employment-related civil case asserting claims under the Americans with Disabilities Act ("ADA") along with a state law breach of contract claim, the defendant has moved for summary judgment. For the reasons that follow, I will grant the motion as to the ADA claims but will deny the motion as to the breach of contract claim.

I.

The following facts are taken from the summary judgment record and, where disputed, are stated in the light most favorable to the plaintiff as nonmovant.

Plaintiff Gregory Kelly became the Town Attorney for the Town of Abingdon ("Town") in 2005. He was appointed Town Manager in September

2006.  Town Council meeting minutes from that month summarize the terms of his

employment as follows:

I.   **Compensation**

    a.   $100,000 base salary with standard Town employee benefits.  Salary to be reviewed at least yearly upon the adoption of each year's annual budget.

    b.   $3,100.00 (or such amount representative of the annual cost of health insurance) to be paid into an ICMA, VRS or equivalent retirement plan as designated by the Town Manager on November 1, 2006 and each fiscal year thereafter.

    c.   The guarantee to return to the position of Town Attorney should serving in the capacity of Town Manager not be successful.

    d.   Nine (9) Months severance pay at the current amount of the Town Manager's salary and benefits at the time of departure if serving in the capacity of Town Manager is not successful and the position of Town Attorney is not available.

II.   **Education Expenses**

    a.   The Town will pay all educational and incidental expenses in the pursuit of a Master's Degree in Public Administration or related field.

    b.   The cost of all annual Continuing Legal Education and incidental expenses required by the Virginia State Bar to remain actively licensed to practice law in Virginia.

    c.   All membership fees, conference costs and incidental expenses for LGA, IMLA, ICMA and VML.

Mem/ Supp. Mot. Summ. J. Ex. 1, Kelly Dep. Ex. W, ECF No. 63-1.

In his deposition, Kelly discussed how he had negotiated the terms of his

employment with the Town Council at the time.  Kelly requested that he be entitled

to a severance payment equaling two years of his salary and benefits, and the Town Council countered by offering three months of severance pay. Some back and forth ensued, and the parties settled on a severance payment equal to nine months of Kelly's salary plus benefits. Regarding the "not successful" term stated in the meeting minutes, Kelly testified:

> Basically, it was my understanding, and I think council's understanding, that if something didn't work out between either party that required me to walk away or for them to get rid of me, it would be deemed unsuccessful, and I would be entitled to nine months severance at the rate that I was earning at that time, not at the $100,000 rate.

Pl.'s Br. Opp'n Mot. Summ. J. Ex. 1, Kelly Dep. 20, ECF No. 72-1. Kelly testified that the minutes were simply a summary of the parties' agreement and that the terms were later memorialized in a separate formal employment contract.

The signed final employment contract has either been lost or never existed. It was not produced in discovery, and no witness other than Kelly claims to have seen it. The mayor at the time who would have signed it on behalf of the Town is in declining health and was not deposed.

Kelly produced a draft employment contract that he says he prepared at the request of Vice Mayor Ed Morgan following the September 2006 Town Council meeting where the parties agreed on the terms of Kelly's employment. Kelly testified that the draft "reflects all the details of what the agreement between me and the town was upon being hired." *Id.* at 23. Kelly stated that Morgan gave him

handwritten notes summarizing the terms discussed and instructed him to "'[g]o prepare contract and have a copy of the notes and contract put with the minutes of the town council.'" *Id.* "Ed wrote large notes on small pieces of paper, and those notes were placed with . . . the signed document, and was directed to be put in the vault where all the town contracts were to be kept and also with the minutes. That's one thing that Ed made sure was that he wanted a copy of this to be put with the minute book." *Id.* at 24. Kelly testified that he and the mayor at the time, Lois Humphreys, both signed the contract, and Humphreys was to place it with the minutes in the vault.

The draft Kelly produced had been located in a file folder in his garage that also contained his resume and other materials from when he applied for the Town Manager job. At various points, Kelly and several Town Council members searched for the signed contract in the Town vault, but it was never found. The evidence suggests that access to the vault was not tightly controlled and many people could have gained access over the years.

Regarding the length of time for which the employment contract would be in effect, Kelly testified:

> It was my understanding that it was perpetual as long as I was town manager, and upon me leaving, it would be enforced by either party. If they choose they didn't want me around, they could simply pay me or put me back in the position of town attorney if it was still available. Likewise, I had that right as well, to walk away, take the severance, or go back to the town attorney position, if it was available.

*Id.* at 29–30.  Kelly stated that it was his understanding that even if he voluntarily retired from his role as Town Manager, he would still be entitled to the severance payment.  He referenced a situation in the neighboring City of Bristol, Virginia, where an outgoing City Manager had received a severance payment equal to two years' salary and benefits upon his retirement, which had occurred not long before Kelly's appointment as Town Manager.  That situation had garnered negative press attention, so the Town Council did not want to grant Kelly such a large "golden parachute" severance package.  *Id.* at 33–34.  As a result, the parties agreed on the smaller amount of nine months' salary and benefits.  According to Kelly, the availability of the severance payment was the same, however: he would be entitled to it when his employment ended, regardless of the reason or manner in which it ended.  Kelly stated that the severance payment was intended to account for the time it would take him to secure legal, managerial, or other employment following his departure from the Town.

Kelly testified that he had intended to work for the Town of Abingdon for the remainder of his career.  In his view, the fact that his working conditions forced him to leave his employment rendered his service as Town Manager "not successful" as stated in the meeting minutes.  The position of Town Attorney was not available at the time Kelly's employment as Town Manager ended.

The draft agreement that Kelly produced does not include the phrase "not successful" or anything similar. Instead, it states that should Kelly "cease to be employed by the Town of Abingdon, Virginia, regardless of reason (i.e. resignation, termination, or retirement, etc.), he shall be entitled to nine (9) months of severance pay at the rate of his salary at the time of ceasing employment." Pl.'s Br. Opp'n Mot. Summ. J. Ex. 12, Employment Contract 3, ECF No. 72-12. The draft agreement also states that "a copy of the adopted minutes of the Council meeting" reflecting Kelly's appointment as Town Manager "shall be attached to this employment contract and be incorporated herein by said reference." *Id.* The draft contract states that its terms are "perpetual in nature" but can be modified by mutual written agreement. *Id.* The draft contract further states, "Should either party breach this agreement, the non-breaching party shall be entitled to recover from the breaching party all costs and reasonable attorney's fees associated with the enforcement of this agreement." *Id.*

The draft contract that Kelly produced was printed on lined legal bond paper. He testified that when he was hired as Town Attorney, he used that paper for any legal documents he was preparing for the Town. The Town stopped using legal bond paper around the time Deborah Icenhour became Town Attorney in 2006.

Kelly testified that Town Council member Cathy Lowe periodically made statements to the effect that if Kelly left, the Town would have to pay him nine months' salary as severance pay.  Kelly says she made these statements 10 to 20 times, including on the day that he tendered his resignation.  He testified that Council member Rick Humphreys made similar statements.

Kelly served as Town Manager for approximately 12 years.  Following his departure, the Town paid Kelly for his accrued leave time but did not issue him any severance payment.

Kelly was diagnosed with anxiety at least as early as 2014 and with high blood pressure at least as early as 2016.  Several employees witnessed visible symptoms of his high blood pressure, including profuse sweating and a red face. Former Council members expressed concern for his health and told him to go home when he was not feeling well.

Beginning in 2014 or 2015, local controversy arose regarding a proposed commercial development known as the Meadows.  In 2016, two new Town Council members were elected: Cindy Patterson and Wayne Craig.  Patterson and Craig were both members of a group called Friends of Abingdon ("FOA"), which was formed to oppose the Meadows project.  Patterson ran on an open-government and anti-development platform.  Craig publicly objected to aspects of how the Meadows project had been handled.  They joined Council members Lowe,

Humphreys, and Bob Howard to comprise the Town Council from July 1, 2016 through June 30, 2018.

Leading up to the 2016 election and continuing through the 2018 election, the atmosphere at the Town was politically charged and at times contentious. There was a great deal of in-fighting among Council members.  This environment and Council members' unprofessional behavior led Kelly to file a series of charges of discrimination and retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC").  He filed his first charge in September 2017, a second charge in December 2017, and a final charge in July 2018, following his resignation.

Several employees testified that Kelly was under a lot of stress and pressure from Council members between 2016 and 2018.  Kelly talked about his blood pressure and anxiety in the presence of colleagues.  Council members' conduct exacerbated Kelly's health conditions.  It was obvious that his blood pressure was quite high.  In addition to his red face and sweating, Kelly openly took medication for headaches and sometimes had trouble communicating and articulating his thoughts.

At multiple unspecified times, Kelly told each Council member that he was experiencing extreme anxiety and high blood pressure.  Council members would follow Kelly back to his office after contentious meetings and criticize him,

causing additional stress.  Kelly would tell them about his conditions and that he needed to go home or take a break.  Sometimes he would interrupt a meeting and walk out.  Lowe had previously observed former Vice Mayor Morgan excuse Kelly from meetings due to his health conditions.  When Kelly told Lowe about his conditions, she dismissed his concerns.

In the 2016–2018 time period, on unspecified dates, Council members failed to respect Kelly's boundaries, interrupted his breaks and vacations, and ridiculed him for taking walks and breaks.  Kelly would sometimes lie down at work to try to calm down and reduce his blood pressure.  He would go for walks for the same reason.  Lowe, who was the Mayor at the time, never told Kelly that he could not take breaks or take vacation, although she did say that either Kelly or Assistant Town Manager Cecille Rosenbaum needed to be available at all times and they could not both take vacations at the same time.  On one occasion, Kelly was on vacation in Miami and had to fly back to Roanoke, Virginia, to meet with Council members regarding legal matters for a period of about 12 hours.  Kelly also testified that Council members frequently called him while he was on vacation or at conferences, despite his request that they give him space when he was away from Town Hall.

Council members criticized Kelly for not being in the office enough.  Craig saw Kelly walking in town and told him he looked like a "'streetwalker.'"  Kelly

Dep. 68, ECF No. 72-1.   Kelly could not identify the dates on which these comments were made, but he testified that they occurred after he filed his first EEOC charge in September 2017.   Humphreys, Patterson, and Lowe also made critical comments about Kelly walking and stated that he should be in his office conducting business instead.

In the fall of 2017, Lowe violated Kelly's privacy by looking through his Apple watch and his cell phone.   It is unclear whether this happened before or after Kelly filed his first EEOC charge.   He believes she also surreptitiously gained access to his computer in June 2017.   He suspected she was searching private messages and deleting certain information, but he cannot be sure.   Humphreys once took Kelly's iPad home with him following a Council meeting and locked access to it due to too many failed password attempts.   Other Town employees also believed their communications were being monitored through review of emails as well as security cameras.

Kelly testified that Lowe, Craig, and Humphreys repeatedly threatened him with termination, 50 or more times, on a near-daily basis.   They would ask him frequently if he had found a new job yet.   He believes that this happened both before and after he filed his first EEOC charge.   Lowe's threats and other conduct toward Kelly initially decreased after he filed his EEOC charges — one witness testified that Lowe was being cautious in her communications due to the charges

— but her behavior escalated later after Rosenbaum's employment ended in February 2018. Kelly stated that the threats of termination became more frequent after he filed his EEOC charges, although he could not point to specific dates or documented incidents.

Humphreys threatened to fire one of Kelly's direct reports even though Kelly alone was supposed to have the power to terminate employees in the Council-Manager form of government. Humphreys said that he would fire Kelly if Kelly did not fire the employee. Lowe and Humphreys also pressured Kelly to terminate the police chief because of a supposed unauthorized write-in campaign for Town Council, which they thought had cost another Council member her seat. Lowe pressured Kelly to hire or reinstate certain people or put them in certain positions and threatened termination if he did not comply. Lowe would raise her voice and invade Kelly's personal space, getting very close to him and pointing a finger in his face. In April 2017, Craig told Kelly that he needed to befriend the President of FOA because that was who would call the shots about who would be terminated.

Kelly frequently received profane, angry phone calls and text messages in the middle of the night from Humphreys regarding train whistles and noise from trash dumpsters being emptied. Humphreys owned a bed and breakfast and was concerned about how these things would affect his business.

Lowe would contradict and undermine Kelly, telling him he was wrong and then telling others that everything he was saying was wrong. She told Kelly she would not be managed by the Town Manager and that it was her mission to question everything the Town Manager said. *Id.* at 146. Patterson and Craig behaved disrespectfully and uncivilly during Town Council meetings. Patterson was actively working against Kelly, according to Howard, and FOA was flooding the Town with Freedom of Information Act requests.

Council members would try to put Kelly on the spot at Council meetings, asking him questions he was unprepared to answer, and then publicly imply that he was causing a delay on the issue. They would try to get him to pick sides on contentious issues and would ask his opinion and then do the opposite of what he advised them to do. Council members would try to cause division among appointees and employees "for their own purposes." Pl.'s Br. Opp'n Mot. Summ. J. Ex. 9, Bailey Dep. 57, ECF No. 72-9. Lowe told Rosenbaum she needed to get out of Kelly's shadow while also telling Kelly to get control of Rosenbaum. Humphreys, Patterson, and Craig circumvented Kelly and went directly to department heads and Town employees and asked them to do things.

Humphreys regularly used profanity with Town employees. Craig called various people "'assholes,'" including Kelly. Kelly Dep. 195–96, ECF No. 72-1. Humphreys denigrated employees, yelled at them, and told them they did not know

how to do their jobs.  Humphreys publicly demeaned the Director of Public Works, who resigned his position.  He was later re-hired by a subsequent Council.  In January 2018, Humphreys yelled at and used profanity toward employee Jason Boswell regarding a Historic Preservation Review Board issue involving a roof renovation.  The Town lost five key employees from 2016 to 2018.  Employees complained to Kelly about the Council members, and Kelly felt powerless to do anything because of how the Council members were treating him.

In the spring of 2018, Lowe and Craig had Human Resources Director Stacy Reichler open a bank safety deposit box to store the personnel files of Kelly, Icenhour, and Rosenbaum,[1] the three Town Council appointees.  Reichler said this was highly unusual based on her training.

When he began his employment with the Town, Kelly negotiated for the creation of a computer network drive on which he could store files from his law practice and personal files, to which only he would have access.  At some point during a server migration in or around 2016, the drive ceased to be maintained.  Information Technology Director Floyd Bailey at times provided a backup of the drive at Kelly's request, and one was provided to Kelly recently, although it may only have contained the files as they existed around 2006.  The old server has been recycled, and files can no longer be retrieved from it.  In interrogatory responses,

---

[1]  Icenhour and Rosenbaum had also filed EEOC charges.

the Town said that any files previously assigned to Kelly were reassigned to successor Town Managers by Bailey.  Kelly speculates that the Town intentionally destroyed the documents that were saved on the legal drive, which may have included a copy of his employment contract, but he has presented no evidence of this.  In the course of this litigation, the Town offered to provide personal documents that were stored on the hard drive of Kelly's old work computer if Kelly submitted a supplemental request for documents, but no supplemental request was submitted.

News of Kelly's second EEOC charge appeared in a local newspaper.  The Town's insurer had received a call from a reporter, who had confirmed the existence of the charge.  It is unclear who leaked the information about the charge to the paper.  Lowe and the other Council members learned of the leak but did not investigate or take action regarding this disclosure of confidential personnel information.

The proposed budget for the 2018-19 fiscal year did not include a raise for Kelly.  While Kelly remained employed through the budget process, he had announced his resignation before the budget was adopted.  The appointees had not received pay increases in the 2017-18 fiscal year either.  The budget for that year, however, was adopted in May 2017 and went into effect in July 2017, before Kelly filed his first EEOC charge.

- 14 -

Several witnesses testified that Council members stopped communicating with Kelly after he filed his EEOC charges. This may have been due to a letter from Kelly's attorney to the Town Council members instructing them not to discuss Kelly's claims with him, investigate the claims, or attempt to reach a resolution with him. There is no evidence that the Town Council sought to communicate with Kelly's attorney about Kelly's claims, either directly or through the Town's legal counsel.

Kelly talked to Human Resources Director Reichler about his treatment by Council members. He told her that he was expected to be on call at all times, and Council members were not respecting boundaries around down time. Reichler advised Kelly to set expectations and parameters around his communications with Council members, and she told him he was entitled to have a healthy work-life balance. Reichler did not report Kelly's complaints to Council members.

After Kelly filed his first EEOC charge, Reichler advised Lowe that Kelly needed to be given some down time away from the office and have his boundaries respected. Lowe responded, "That's ridiculous." Pl.'s Br. Opp'n Mot. Summ. J. Ex. 6, Reichler Dep. 55, ECF No. 72-6. After Kelly filed his EEOC charges, Lowe became very aggressive toward him, did not share important information with him, and frequently visited his office. Profane messages from Council members and

disrespectful behavior purportedly increased after Kelly filed his EEOC charges, although there are few details in the record to support this contention.

Between 2016 and 2018, Kelly experienced panic attacks and an exacerbation of his health conditions. He was prescribed medications for his blood pressure and anxiety. He was also prescribed medication to help him sleep. His physician ultimately recommended that he leave his job to protect his health. His need for these medications lessened after he left his employment with the Town.

Kelly filed his first charge of discrimination with the EEOC on September 13, 2017. He checked the boxes on the form for both disability discrimination and retaliation. The details he wrote on the form, however, do not mention retaliation or a request for accommodations. The September 7 charge states, in relevant part:

> Mr. Kelly suffers a disability, to-wit, anxiety and depression. These conditions have been exacerbated due to the often unprofessional and occasionally outrageous actions of several of Mr. Kelly's supervisors, the Town Council of Abingdon and the Mayor of Abingdon. Due to political in-fighting among Council members, Mr. Kelly's disabilities have affected daily life activities. Mr. Kelly works day-to-day in a severe and pervasive hostile working environment. Despite performing his job exceptionally well, he has been threatened with termination. . . . Mr. Kelly has been subjected to insults, invasions of privacy, disclosure of confidential information, and profane and obscene messages from Town leadership.

> Mr. Kelly has been threatened and mocked by Abingdon leadership due to his disability and is concerned for his livelihood. Upon information and belief, Abingdon leadership has defamed him to community groups. Abingdon leadership has discussed and disseminated confidential personnel information to third parties, the

- 16 -

> public and representatives of the media.  Abingdon leadership has at
> times, operated with disregard to local ordinances.

Kelly Dep. Ex. B, ECF No. 63-1.  A Notice of Suit Rights regarding this charge

was mailed to Kelly's counsel on December 12, 2017.  Kelly did not file suit

within the required 90 days.

Kelly filed his second charge on December 21, 2017.  Here, he repeated

some of the statements in his first charge and added the following:

> Mr. Kelly has continued to suffer from . . . retaliatory [sic]
> towards his disability and for filing a Charge of Discrimination on
> September 13, 2017. . . .

> Mr. Kelly was informed by the Director of Human Resources
> for the Town of Abingdon that the Mayor of Abingdon held an in-
> person meeting with her on October 5, 2017.  The Mayor inquired
> whether Mr. Kelly could be terminated and/or not reappointed to his
> position.  The Mayor expressly stated that her desire was for the
> "EEOC Charge to go away."

> Further, while my co-worker Cecille Rosenbaum, who has also
> filed a charge of discrimination with the EEOC, left town for a bit, the
> Mayor and Vice-Mayor met with me to tell me I needed to get Ms.
> Rosenbaum "under control" or they would terminate me.  Ms.
> Rosenbaum has done nothing against office practice or policy to
> warrant any threat of termination.  For that matter, neither have I.

> The Mayor has further directed Mr. Kelly to install a personal
> friend in the Community Development Coordinator position or risk
> termination.  In addition, the Mayor and Vice Mayor continually
> contact the Directors of Parks and Planning and Code Enforcement,
> direct reports to Mr. Kelly.  Upon information and belief, the Mayor
> and Vice Mayor circumvent Mr. Kelly due to filing a Charge of
> Discrimination and/or because of his disability.

Kelly Dep. Ex. C, ECF No. 63-1.  A Notice of Suit Rights regarding this charge

was mailed to Kelly's counsel on January 28, 2018.  Kelly again did not file suit

within 90 days.

Kelly filed his third and final EEOC charge on July 10, 2018.  In this charge,

he referenced for the first time a request for accommodations.  This third charge

repeated many of the statements in the prior charges and added the following:

> Despite performing his job exceptionally well, he was continuously
> threatened with termination if he did not do as certain council
> members directed despite being bound by law and a strict code of
> local government ethics to implement only the policies enacted by the
> collective majority of the council. . . . Mr. Kelly . . . has been publicly
> ridiculed and defamed on several occasions.  Mr. Kelly's health issues
> became threatening enough for his physician to inform him that he
> should request accommodations or remove himself from his working
> environment in order to protect himself from worsening and depleting
> health.
>
> Mr. Kelly has continued to suffer from discriminatory animus
> towards his disabilities and retaliation due to his disabilities and for
> filing Charges of Discrimination. . . .
>
> On January 10, 2018, Mr. Kelly requested several reasonable
> accommodations for his disabilities.  The Town refused to engage in
> the interactive process in any meaningful way in order to find
> accommodations to Mr. Kelly's disabilities.  Mr. Kelly only received
> a token communication from the Town's legal counsel several months
> later, in or about April of 2018, stating that the Town would engage in
> the interactive process.   When Mr. Kelly attempted to further
> communicate with the Town concerning the interactive process, he
> did not receive further reply from the Town or the Town's legal
> counsel.
>
> On or about May 7, 2018, due to the severe and pervasive
> hostile work environment targeting individuals with disabilities, Mr.

> Kelly had no alternative but to resign his employment.  Mr. Kelly
> attempted to work in an untenable work environment.  However,
> because of the abusive nature of that work environment, Mr. Kelly
> suffered a constructive discharge.

Kelly Dep. Ex. D, ECF No. 63-1.  Kelly timely filed suit after receiving the Notice of Suit Rights letter pertaining to this charge.  While the charge mentions accommodations, it refers only to a letter from his counsel to the Town that I previously ruled did not to contain requests for disability-related accommodations. *Kelly v. Town of Abingdon*, 437 F. Supp. 3d 517, 522, 528 (W.D. Va. 2020).  The charge does not mention a request for short breaks, walks, or any other kind of accommodation.

Kelly had begun searching for another job in November 2017.  He was offered and accepted a position with his current employer on April 4, 2018.  He submitted his resignation letter on April 18, 2018, but his resignation was not effective until May 7, 2018, following the annual budget process.  In other words, he did not actually leave his employment with the Town for more than a month after he accepted another job.  Kelly testified that he felt ethically obligated to stay through the budget process because no one else knew how to do it.  Kelly's resignation letter was cordial and did not raise any complaints or suggest that he considered himself to be constructively discharged.

Lowe, Humphreys, and Howard announced in the spring of 2018 that they would not be seeking reelection that year.  While Craig and Patterson would

remain on Council until mid-2020, Kelly knew when he resigned that three new Council members would take office on July 1, 2018.

On this record, the Town seeks summary judgment on all three of Kelly's remaining claims.[2]  The motion has been fully briefed and orally argued.

## II.

### A.  *Summary Judgment Standard.*

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if its existence or non-existence could result in a different jury verdict.  *JKC Holding Co. v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).  When ruling on a summary judgment motion, the court should consider the parties' pleadings, depositions, answers to interrogatories, admissions on file, and affidavits.  *Celotex Corp. v. Catrett ex rel. Catrett*, 477 U.S. 317, 322 (1986).   "[T]he nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."  *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783 (4th Cir. 2021) (unpublished)

---

[2]  Other claims contained in the Amended Complaint, Count I (ADA Discrimination) and Count IV (ADA Interference), were previously rejected by the court, leaving only Count II (ADA Retaliation), Count III (ADA Accommodation), and Count V (Breach of Contract).  *Kelly v. Town of Abingdon*, No. 1:19CV00032, 2020 WL 2553614, at *8 (W.D. Va. May 20, 2020).

(quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015)).

"[C]ourts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 568 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2728 (3d ed. 1998)). The court may not assess credibility on a motion for summary judgment. *Id.* at 569.

Summary judgment is not a disfavored procedural shortcut, but an important mechanism for weeding out claims and defenses that have no factual basis. *Celotex Corp.*, 477 U.S. at 327. It is the affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial. *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993).

### B. ADA Retaliation Claim.

"A plaintiff may demonstrate retaliation though either direct evidence of retaliation or through the *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792, 802–05 (1973),] pretext framework." *Johnson*, 839 F. App'x at 783 (citing *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013)). Here, Kelly has produced

no direct evidence of retaliation,[3] so we proceed through the familiar *McDonnell Douglas* burden-shifting framework.

To establish a claim of retaliation under the ADA, a plaintiff must show that "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012). The first element is not contested here; filing a charge of discrimination with the EEOC is protected conduct under the ADA.

As for the second element, in the retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse," meaning it could have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks and citation omitted). "[I]t is

---

[3] Rosenbaum testified that after the appointees filed their EEOC charges, Lowe asked Reichler "how could she get rid of us." Pl.'s Br. Opp'n Mot. Summ. J. Ex. 8, Rosenbaum Dep. 75, ECF No. 72-8. Kelly similarly testified that Reichler told him, "The mayor just came to see me and inquired in terms of whether or not they could terminate you and make these charges go away." *Id.* at Ex. 1, Kelly Dep. 194, ECF No. 72-1. This is inadmissible hearsay that I cannot consider in deciding the Motion for Summary Judgment. Reichler herself did not so testify. "Only evidence that would be admissible at trial may be considered for summary judgment purposes." *Hunter v. Prince George's Cnty.*, 36 F. App'x 103, 106 (4th Cir. 2002) (unpublished). "[H]earsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1251 (4th Cir. 1991). The burden is on the proponent of summary judgment material to show its admissibility. Fed. R. Civ. P. 56(c)(1)(B) advisory committee's note to 2010 amendment. With respect to these statements, Kelly has not met that burden.

important to separate significant from trivial harms," as federal employment laws do not create "a general civility code for the American workplace." *Id.* (internal quotation marks and citation omitted). "[N]ormally petty slights, minor annoyances, and simple lack of good manners will not" deter a reasonable worker from engaging in protected activity. *Id.*

Kelly claims that one of the adverse actions he suffered was a constructive discharge. "The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign." *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016) (internal quotation marks and citation omitted). In such a situation, the law will treat the employee's resignation as a discharge. *Id.* at 1776–77.

"In assessing intolerability, the frequency of the conditions at issue is important." *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019). "[W]hen the conduct is isolated or infrequent, it is less likely to establish the requisite intolerability." *Id.* But "[t]he more continuous the conduct, the more likely it will establish the required intolerability." *Id.* "Further, difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign." *Id.* The question is not whether resigning was the plaintiff's wisest or best choice under the circumstances, but rather whether a reasonable person in the

plaintiff's position "would have had *no choice* but to resign." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019) (internal quotation marks and citation omitted). This standard is higher than the severity or pervasiveness required to prove a hostile environment harassment claim. *Id.*

An ADA retaliation claim requires "but for" causation. *United States ex rel. Cody v. ManTech Int'l, Corp.*, 746 F. App'x 166, 177 (4th Cir. 2018) (unpublished) (citing *Gentry v. E.W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235–36 (4th Cir. 2016)). There are two ways to establish the causation element of a retaliation claim. "First, a plaintiff may establish that the adverse act bears sufficient temporal proximity to the protected activity." *Johnson*, 839 F. App'x at 784. "Second, a plaintiff may establish the existence of other facts that alone, or in addition to temporal proximity, suggests that the adverse employment action occurred because of the protected activity." *Id.* "To avoid summary judgment, the plaintiff must produce direct evidence of a stated purpose to discriminate and/or indirect evidence of sufficient probative force to reflect a genuine issue of material fact." *Jacobs*, 780 F.3d at 577 (citations omitted). "What is required is evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Id.* at 577–78 (citations omitted).

"Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (citation omitted). "[W]hen animus already exists between the plaintiff and his employer prior to the protected activity at issue, the plaintiff needs to be able to show that his protected conduct 'changed' the 'status quo' in some fashion." *ManTech Int'l*, 746 F. App'x at 181 (quoting *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 349 (4th Cir. 2014)).

Claims raised in an EEOC charge are time-barred if not asserted in a federal lawsuit within 90 days of receiving a Notice of Right to Sue letter for the charge. 42 U.S.C. § 2000e-5(f)(1).   A number of courts have held that when a plaintiff has filed a series of EEOC charges but has not filed suit within 90 days of dismissal of the earlier-filed charges, the notice of dismissal of the final charge does not serve to revive time-barred claims raised in the earlier charges. *See, e.g.*, *Wade v. Knoxville Utils. Bd.*, 259 F.3d 452, 460 (6th Cir. 2001); *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 203 (E.D.N.Y. 2014); *Woods v. Lancaster Indep. Sch. Dist.*, 834 F. Supp. 2d 512, 516 (N.D. Tex. 2011); *Felix v. City & Cnty. of Denver*, 729 F. Supp. 2d 1243, 1250–51 (D. Colo. 2010).

"[T]he continuing violation theory does not eliminate the requirement that a plaintiff file a judicial action within ninety days of receipt of notice of the right to sue."  *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 926 F.2d 959, 962 (10th Cir. 1991).  The continuing violation doctrine, which tolls the statute of limitations for filing a claim with the EEOC, is meant to ensure "that meritorious discrimination claims are not pretermitted because the claimant needed to experience a pattern of repeated acts before she could be expected to realize that the individual acts were discriminatory in nature."  *Loubriel v. Fondo del Seguro del Estado*, 694 F.3d 139, 144 (1st Cir. 2012).

> This purpose would not be served by extending the 90-day filing period. . . .  By the time that she receives a right-to-sue notice, a claimant is necessarily aware of the defendant's discriminatory conduct; she has by then already recognized the occurrence of discrimination and filed her administrative claim.

*Id.*; *see also Gibbs v. Gen. Motors Corp.*, 104 F. App'x 580, 582 (7th Cir. 2004) (unpublished) ("Gibbs cannot avail herself of the continuing-violation doctrine because she obviously believed that the time-barred acts were discriminatory when she filed EEOC charges in early 2001.").

The Town asserts several grounds in support of its Motion with respect to Kelly's retaliation claim.  It first contends that Kelly cannot now complain about incidents he raised in his first two EEOC charges because he did not timely sue on those charges, and those claims are now time-barred.  This argument only goes to

the constructive discharge claim; the other alleged adverse actions — failure to give a deserved pay raise and failure to make a severance payment — would have occurred only after Kelly had filed his second charge with the EEOC and formed the basis of his third charge, on which he timely filed suit.

The Town also argues that Kelly has failed to prove the existence of any adverse action.   Finally, the Town contends that Kelly has not established a genuine issue of fact as to whether the purported adverse actions occurred because of Kelly's protected activity, the filing of his EEOC charges.

The final argument is the most compelling.  Even if Kelly has established that his work environment was so objectively intolerable that he had no choice but to resign, the record is virtually devoid of evidence tying Council members' treatment of him to his EEOC charges.   Based on Kelly's evidence, Lowe, Humphreys, Patterson, and Craig treated him poorly before he filed his EEOC charges, and they continued to treat him poorly after he filed his charges.  They did so for their own reasons, such as Humphreys' private business concerns about his bed and breakfast and Patterson's and Craig's political agendas pertaining to the Meadows development.  Indeed, there are so few details and dates set forth in the record that it is difficult to even discern which conduct occurred before Kelly filed his charges and which incidents occurred after he began engaging in protected activity.   Testimony by Kelly and Rosenbaum generally stating that Council

members' behavior worsened after the EEOC charges is too vague and conclusory to raise a genuine issue of material fact.  On the record before the court, no reasonable jury could conclude that any constructive discharge which may have occurred would not have happened but for Kelly's protected activity under the ADA.

Kelly fares no better with respect to his other alleged adverse actions.  He resigned as Town Manager in April, before the budget process for the coming year.  Any complaint that he did not receive a raise for the 2018-2019 fiscal year is nonsensical, as he no longer worked for the Town during that year.  If his complaint is that the budget that was proposed just prior to his departure should have included a raise for him, that argument also falls flat, as he had announced his resignation several weeks before the budget was adopted.  And if he contends he should have received a raise in the prior 2017-2018 fiscal year, the denial of such a raise could not have been retaliatory because the decision would have been made by July 2017, nearly three months before he filed his first charge with the EEOC.

The record further contains no evidence raising any inference that the Town decided not to give Kelly severance pay because he had filed EEOC charges.  The record does not reveal that the Town Council ever voted on whether to issue Kelly a severance payment or even met to discuss his severance agreement.  At most, the record suggests that some Town Council members believed he was not entitled to

- 28 -

any severance payment because he quit. Any suggestion that the Town would have given Kelly a severance payment but for his ADA-protected activity is pure speculation, which is insufficient to overcome a motion for summary judgment.

Because Kelly has failed to establish a prima facie case of retaliation, it is unnecessary to proceed through the remainder of the burden-shifting analysis. I will grant the Town's Motion as to Kelly's ADA retaliation claim.

### C. Failure to Accommodate Claim.

The ADA requires an employer to "make reasonable accommodations for an applicant or an employee's disability." *EEOC v. Fed. Express Corp.*, 513 F.3d 360, 371 (4th Cir. 2008). A plaintiff claiming a failure to accommodate must establish that "(1) he suffered a disability; (2) his employer knew of the disability; (3) with reasonable accommodations, he was otherwise qualified to perform the essential functions of the job; and (4) his employer refused to make such reasonable accommodations." *Baker v. City of Chesapeake*, 644 F. App'x 222, 224 (4th Cir. 2016) (unpublished) (citing *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013)). "Implicit in the fourth element is the ADA requirement that the employer and employee engage in an interactive process to identify a reasonable accommodation." *Haneke v. Mid-Atl. Capital Mgmt.*, 131 F. App'x 399, 400 (4th Cir. 2005) (unpublished); *see* 29 C.F.R. § 1630.2(o)(3).

The Town contests the final element, asserting that it never denied Kelly the accommodations he says he requested, namely short breaks and walks.  It also argues that Kelly is barred from asserting this claim because he did not specifically allege in his final EEOC charge that he requested and was refused the ability to take short breaks or walks.  The Town further contends that Kelly has not produced sufficient evidence showing that he actually requested accommodations in the form of walks or short breaks.

It is undisputed that Kelly did in fact take walks and breaks.  While he worked long hours, it is further undisputed that he took vacations and attended conferences.  Individual Council members may have criticized him from time to time for leaving Town Hall, but he apparently did so anyway.  There is no evidence that he was ever disciplined for doing so.  The Town did not refuse him this accommodation.

Kelly's evidence does not paint the picture of an ideal working environment, and Council members' alleged behavior is certainly not a model of employee relations.  But the ADA does not require elimination of stress and criticism, even for an employee with anxiety and high blood pressure.

Kelly was the chief executive for the Town.  His position of Town Manager was a political appointment, and he served under five elected officials, each with their own agendas.  In this kind of position, stress and a precarious work-life

balance are likely unavoidable.  While he only claims to have needed to take short breaks and walks to preserve his health, it is clear that what he really wanted was for Council members to be nicer to him, respect his decisions, and not bother him so much.  These are not reasonable disability-related accommodation requests; they are general grievances about his supervisors.  The undisputed evidence fails to create a genuine issue of material fact as to Kelly's failure-to-accommodate claim. I will therefore grant the Town's Motion as to this claim.

### D.  Breach of Contract Claim.[4]

Virginia substantive law governs the plaintiff's breach of contract claim brought pursuant to the court's supplemental jurisdiction. *Musselwhite v. Mid-Atl. Rest. Corp.*, 809 F. App'x 122, 127 (4th Cir. 2020) (unpublished) (citing *South Atl. Ltd. P'ship of Tenn., L.P. v. Riese*, 284 F.3d 518, 530 n.15 (4th Cir. 2002)).  Under Virginia law, the elements of a breach of contract claim are: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  *Navar, Inc. v. Fed. Bus. Council*, 784 S.E.2d 296, 299 (Va. 2016) (internal quotation marks and citations omitted).

---

[4]  Because I have granted summary judgment as to Kelly's ADA claims, which provide the basis for federal question jurisdiction, I could decline to exercise supplemental jurisdiction over the state law breach of contract claim.  28 U.S.C. § 1367(c)(3).  In the interest of judicial efficiency, however, I will retain supplemental jurisdiction over Count V.

"A contract will be enforced if its obligations are reasonably certain." *R.K. Chevrolet, Inc. v. Hayden*, 480 S.E.2d 477, 480 (Va. 1997). "Even if some terms of a contract are uncertain, it may be read in the light of the surrounding circumstances, and, if from such reading, its meaning may be determined, the contract will be enforced." *Id.* "Further, when the entire agreement has not been reduced to writing, parol evidence is admissible, not to vary or contradict the terms of the written instrument, but to show other facts agreed upon in order to establish the parties' entire contract." *Id.*

"It is elementary that mutuality of assent — the meeting of the minds of the parties — is an essential element of all contracts." *Phillips v. Mazyck*, 643 S.E.2d 172, 175 (Va. 2007) (citations omitted). "Until the parties have a distinct intention common to both and without doubt or difference, there is a lack of mutual assent and, therefore, no contract." *Id.* (citations omitted).

The first question with respect to Kelly's breach of contract claim is whether Kelly and the Town ever executed a separate written employment contract aside from the summary set forth in the September 2006 meeting minutes. The evidence on that point is clearly in dispute. That factual issue alone is sufficient to avoid summary judgment.

The Town focuses on the "not successful" phrase in the meeting minutes. It argues that Kelly's service as Town Manager *was* successful given that he served

in that role for twelve years.  It further argues that Kelly's interpretation of the severance term — that he is entitled to a severance payment regardless of why his employment ends — renders the phrase "not successful" meaningless.  The Town also contends that there was no meeting of the minds as to the meaning of the phrase "not successful," and the severance provision is therefore void.

But if there was in fact a separate, formal employment contract executed by the parties, then the meeting minutes are merely parol evidence as to the meaning of that contract.  The severance provision in the draft employment contract produced by Kelly is unambiguous — neither party contends otherwise.  When a contract is unambiguous, we do not look to parol evidence to determine its meaning. *Robinson-Huntley v. George Washington Carver Mut. Homes Ass'n*, 756 S.E.2d 415, 429 (Va. 2014).

Kelly has produced evidence of a separate signed employment contract and what it said.  The evidence consists of (1) his own testimony that Lois Humphreys signed the contract and intended to place it in the vault, (2) an unsigned draft contract printed on paper that he routinely used around the time the contract would have been executed, but that he no longer uses, and (3) the meeting minutes, which plainly indicate that the parties agreed to a severance term.  This is enough to send his breach of contract claim to a jury.  While the best evidence rule generally requires the production of the original writing itself rather than other evidence

about its contents, Federal Rule of Evidence 1004(a) provides an exception where "all the originals are lost or destroyed, and not by the proponent acting in bad faith."  There is no indication that Kelly lost or destroyed the original employment contract in bad faith.  "As with all other issues of fact, the trier of fact determines whether the asserted original ever existed and whether the other evidence accurately reflects the original's contents."  *Klopman v. Zurich Am. Ins. Co. of Ill.*, 233 F. App'x 256, 258 (4th Cir. 2007) (unpublished).

To the extent Kelly relies on the meeting minutes, he does so as a fallback position.  His stance is that there was a formal written employment contract, but should the jury disagree and find that there was no formal contract, then the minutes serve as a memorialization of the parties' agreement.  Thus, the court will only need to discern the meaning of the phrase "not successful" if the finder of fact finds that the purported written employment contract signed by Lois Humphreys never existed.

The Town argues that the Town Council which voted on Kelly's terms of employment in 2006 did not have the authority to bind a future Town Council to a severance obligation.  The Town points to Dillon's Rule, which provides that a town council possesses "only those powers that are (1) expressly granted by the General Assembly, (2) necessarily or fairly implied from those express powers, and (3) essential to the declared objects and purposes of the municipality."

*Dumfries-Triangle Rescue Squad, Inc. v. Bd. of Cnty. Supervisors of Prince William Cnty.*, 849 S.E.2d 117, 120 (Va. 2020) (internal quotation marks and citations omitted).  The General Assembly has granted local governing bodies all powers

> pertinent to the conduct of the affairs and functions of the municipal government, the exercise of which is not expressly prohibited by the Constitution and the general laws of the Commonwealth, and which are necessary or desirable to secure and promote the general welfare of the inhabitants of the municipality and the safety, health, peace, good order, comfort, convenience, morals, trade, commerce and industry of the municipality and the inhabitants thereof, and the enumeration of specific powers shall not be construed or held to be exclusive or as a limitation upon any general grant of power, but shall be construed and held to be in addition to any general grant of power.

Va. Code Ann. § 15.2-1102.  The General Assembly has specifically given local government entities the power to appoint officers and hire employees so long as that appointment is without a definite term.  Va. Code Ann. § 15.2-1503.  The Abingdon Town Charter also expressly provides for the appointment of a town manager.  Town of Abingdon Charter § 4.2, *available at* https://law.lis. virginia.gov/charters/abingdon/ (last visited Sept. 3, 2021).

The Town asserts that the foregoing statutory grants of authority necessarily and fairly imply the authority to pay and provide benefits for town managers.  It contends, however, that "the authority of one council to bind the Town and a future council to severance payments for appointees and employees who leave the

Town's employ cannot be said to be necessarily or fairly implied" from these express grants of authority. Mem. Supp. Mot. Summ. J. 25–26, ECF No. 63.

The Town cites *ACA Financial Guaranty Corp. v. City of Buena Vista*, 917 F.3d 206 (4th Cir. 2019), for the proposition that "agreements subject to future appropriations by future governing bodies are not enforceable." Mem. Supp. Mot. Summ. J. 26, ECF No. 63. The *ACA* case is readily distinguishable. It involved ongoing rent payments, and the agreement at issue specifically stated that the payments were subject to future annual appropriations decisions. The case makes no mention of Dillon's Rule.

I find that the legislative grant of authority to appoint officers such as town managers necessarily and fairly implies the power to compensate them for their work. Compensation packages routinely include not just basic salaries but health insurance, retirement plans, and various other benefits, including severance packages. The asserted severance agreement between the Town and Kelly does not violate Dillon's Rule. I will deny the Motion for Summary Judgment as to Kelly's breach of contract claim.[5]

---

[5] The plaintiff has filed a motion seeking to exclude the defendant's disclosed vocational and rehabilitation expert witness. Because it is not apparent that this expert's testimony would be relevant to the breach of contract claim, I will deny this motion as moot, on the assumption that this expert will not testify.

III.

For the foregoing reasons, it is **ORDERED** that the Motion for Summary Judgment, ECF No. 62, is GRANTED IN PART and DENIED IN PART. The Motion is granted as to Counts II and III. The Motion is denied as to Count V, which will procced to jury trial. It is further **ORDERED** that Plaintiff's Motion to Exclude Defendant' Expert Witness, ECF No. 64, is DENIED as moot.

ENTER: September 7, 2021

/s/ JAMES P. JONES
Senior United States District Judge